1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF OKLAHOMA

3   (1) ROBERT BALES and          )
    (2) DANIELLE BALES,            )
4                                  )
          Plaintiffs,              )
5                                  )
    -vs-                           ) No. 22-CV-00851
6                                  )
    (1) STATE FARM FIRE and        )
7       CASUALTY COMPANY,          )
                                   )
8        Defendant.                )

9

10

11          DEPOSITION OF JAMES RYAN PHILLIPS

12

13          TAKEN ON BEHALF OF THE PLAINTIFFS

14               IN TULSA, OKLAHOMA

15

16               ON JULY 14, 2023

17

18

19

20

21

22

23

24

25          REPORTED BY:  KASEY D. EGELSTON, CSR

J.R. Phillips
7/14/2023

Page 14

1    Q   What did you do for State Farm right out of
2  college?
3    A   I was a claims adjuster.
4    Q   What kind of claims were you adjusting at
5  that time?
6    A   Initially, I was handling casualty claims,
7  along with first-party commercial claims.
8    Q   And that -- you would have started that job
9  with State Farm in about 2008 or, I guess, 2006?
10   A   I'm trying to think.  Yes.  Approximately
11  2006.  May of 2006.
12   Q   And how did you come to start working for
13  State Farm?
14   A   They were present at a job fair at Oklahoma
15  State University in Tulsa and actually provided the
16  best salary out of the other options I had.
17   Q   Okay.  After you -- since you started
18  working for State Farm in about 2006, or so, have
19  you worked for any other companies?
20   A   I have not.
21   Q   You've been with State Farm the entire time
22  since after you graduated from college?
23   A   Yes, sir.
24   Q   Have you been a claims adjuster that entire
25  time?

Page 15

1    A   Yes, sir.
2    Q   Ever held any kind of managerial position
3  or anything like that?
4    A   I have not.
5    Q   Have you -- excuse me.  Have you adjusted
6  casualty claims or first-party commercial claims the
7  entire time you've worked for State Farm?
8    A   I have not.
9    Q   What other types of claims have you
10  adjusted?
11   A   I do not currently handle casualty claims,
12  so I just handled the casualty for approximately
13  four or five years at that time, but the remaining
14  time I've handled first-party claims.
15   Q   Ever adjust motor vehicle claims?
16   A   Never worked on autos.
17   Q   Personal injuries, anything like that,
18  liability claims?
19   A   On the auto side, I have not.
20   Q   Do you have any construction experience?
21  Ever work in construction?
22   A   I did in high school.
23   Q   Okay.
24   A   For Burggraf Restoration and also for
25  Norris Construction.

Page 16

1    Q   Okay.  And what did you do for them?
2    A   General laborer.
3    Q   Okay.  What kind of construction did those
4  two companies do?
5    A   I believe Norris Construction was a general
6  contractor.
7    Q   Okay.
8    A   And Burggraf is a mitigation company, water
9  mitigation from fire.
10   Q   Did you ever work on a roof?
11   A   I did not.
12   Q   Put on a roof?
13   A   I never have, no.
14   Q   Installed a roof?
15   A   I have not.
16   Q   Repair a roof?
17   A   I have not.
18   Q   About how long did you work for -- about
19  how long did you work in construction, like a labor
20  hand.  Is it fair to say --
21   A   Yes.
22   Q    -- you were a labor hand for these
23  construction companies?
24   A   Yes.
25   Q   About how long did you do that?

Page 17

1    A   About two or three summers.
2    Q   Okay.  So you worked in the summers in high
3  school?
4    A   Yes.
5    Q   Go back to school and work the next summer?
6    A   Yes.
7    Q   About three summers or so?
8    A   That's correct.
9    Q   When did you first get your adjuster's
10  license?
11   A   When I was first hired by State Farm.
12   Q   So 2006, approximately?
13   A   Yes, sir.
14   Q   Do you hold an active adjuster's license in
15  Oklahoma?
16   A   I do.
17   Q   Do you hold an active adjuster's license in
18  any other states?
19   A   Yes, I do.
20   Q   Which other states?
21   A   I believe Florida, North Carolina, South
22  Carolina and I want to say Louisiana.
23   Q   Have you adjusted claims for State Farm in
24  Florida, North Carolina, South Carolina and
25  Louisiana?

Page 34

1   Q   What about speeds of wind?
2   A   Yes.
3   Q   Like what speed of wind it might take to
4   cause damage to a composition shingled roof?
5   A   Yes.
6   Q   Did you also receive training on how to
7   identify damage on roofs not caused by a storm?
8   A   Yes.
9   Q   Okay.  So training on how to identify
10  blisters?
11  A   Correct.
12  Q   What's a blister on a shingle?  On a
13  composition shingle?
14  A   A blister is typically caused by excess
15  heat in the attic and the blister typically will
16  expand and pop from the bottom outward and there
17  should be a pit where there's fibers showing in the
18  center of that blister.
19  Q   There could be -- you described blisters as
20  popping open.  There could be popped open blisters
21  and closed blisters.  Fair?
22  A   Yes.
23  Q   Not every blister you see is going to be
24  popped out yet.  Is that true?
25  A   In my experience, yes, that is correct.

Page 35

1   Q   Have you ever been out -- have you ever
2   been on an inspection of a composition shingled roof
3   and seen closed blisters --
4   A   Yes.
5   Q   -- on shingles?  What -- other types of
6   non-storm related damage might be wear and tear.
7   Fair?
8   A   Can you repeat that question?
9   Q   It was a bad question.  In your training
10  for identifying damage to roofs, other than
11  storm-related damages, we talked about blisters, you
12  might also have received training on wear and tear
13  damage.  True?
14  A   Yes.
15  Q   Wear and tear can be granular loss?
16  A   Yes.
17  Q   Mechanical damage?
18  A   Yes.
19  Q   You might encounter shingle defects.  True?
20  A   Yes.
21  Q   And you're trained on how to identify all
22  of these types of damage?
23  A   I am.
24  Q   How to distinguish that type of damage
25  versus hail or wind?

Page 36

1   A   Yes, sir.
2   Q   In the context of wear and tear damage to a
3   roof, what age of a roof would you expect to start
4   seeing wear and tear damage?
5       MR. BROWN:  Object to the form.  Go
6   ahead.
7       THE WITNESS:  I don't believe there's
8   an exact date that you can put on a roof for that.
9   Q   (By Mr. Lawson)  What about blisters, how
10  long might it take for blisters to start showing on
11  a roof?
12      MR. BROWN:  Object to the form.  Go
13  ahead.
14      THE WITNESS:  It's the same thing.  You
15  can't put an exact date or time, but you'll start
16  seeing them versus not.
17  Q   (By Mr. Lawson)  I also mentioned granular
18  loss.  Granular loss can be indicative of wear and
19  tear damage.  True?
20  A   Yes.
21  Q   Granular loss can also occur as a result of
22  hail.  True?
23  A   Yes.
24  Q   If hail hits the shingles, it might knock
25  some of the granules off.  True?

Page 37

1   A   Yes.
2   Q   In that situation, that would be covered by
3   a policy.  True?
4       MR. BROWN:  Object to the form.
5   Q   (By Mr. Lawson)  If a State Farm policy
6   provides coverage to hail damage to a roof, hail
7   damage that has caused granular loss would be
8   covered under that policy.  Fair?
9       MR. BROWN:  Object to the form.
10      THE WITNESS:  Granular loss in and of
11  itself does not mean that the shingle has been
12  damaged.
13  Q   (By Mr. Lawson)  If a shingle is hit by
14  hail and granules fall off of a shingle, that would
15  be covered under such a policy.  Fair?
16      MR. BROWN:  Object to the form.
17      THE WITNESS:  Again, granular loss is
18  -- granule loss does not mean -- constitute damage
19  to a shingle.
20  Q   (By Mr. Lawson)  Okay.  Does State Farm
21  provide you with physical training materials?
22  A   I do not have any physical training
23  materials currently.
24  Q   Does State Farm provide you with digital
25  training materials?

Page 158

1  Q   Okay.  What happens after you get off the
2  roof after your second inspection?
3  A   I believe I did -- we did speak to -- I did
4  speak to Meleah.  We kind of spoke, kind of what we
5  summarized and found.  Saying we documented what you
6  have circled.  I don't believe that's hail damage.
7  I do believe she's mentioned, well, I know you guys
8  have to have matting breakage for that to be damage,
9  but she was saying I believe that granular loss is
10  actual damage.  So we discuss that as well.
11  Unfortunately, just granules off a shingle
12  doesn't constitute damage.  And then I said, but we
13  will send this to management for further review and
14  if there's anything further we can do, we'll get
15  back to you.
16  Q   What do the granules on a shingle do?
17  A   They provide you UV protection.  They also
18  act as an assist for accompanying precipitation off
19  of a roof, whether it's rain, most recently around
20  here was sleet, everyone had granules in their
21  downspouts and their property after that sleet storm
22  we had.  Granules are designed to come off the roof
23  to help escort those off of the roof surface.  So
24  there's about 125% of the granules required on that
25  shingle, so when the manufacturer makes that, they

Page 159

1  put 125% of the granules required, so there's tons
2  of granules that come off anyway, but typically,
3  that's what they're designed for.
4  Q   You said that the granules help protect
5  against UV rays?
6  A   Yes.
7  Q   When granules come off of the shingles,
8  does that make the shingle more susceptible to UV
9  rays?
10  MR. BROWN:  Object to the form.
11  THE WITNESS:  Yes.  As with anything,
12  the wear and tear of that shingle lowers the life
13  expectancy and its ability to keep that roof and
14  that attic from getting too hot.  So, as the
15  shingles lose granules over time due to wear and
16  tear, it can definitely cause that, yes.
17  Q   (By Mr. Lawson)  Shingles can also lose
18  granules due to hail; correct?
19  A   Yes.  Shingles lost granules because of the
20  sleet.  And sleet is BB-sized ice pellets.  I would
21  say yes, hail could also do that too.
22  Q   So if sleet causes granular loss on
23  shingles, that would be a covered cause of loss;
24  correct?
25  MR. BROWN:  Object to the form.

Page 160

1  THE WITNESS:  There is no functional
2  damage to the shingle from granular loss.
3  Q   (By Mr. Lawson)  Is there a requirement in
4  this policy that damage has to be functional damage?
5  MR. BROWN:  Object to the form.
6  THE WITNESS:  The policy covers direct
7  physical damage and structural damage.  It is our
8  assertion that for hail, it has to break the matting
9  and compromise the water shedding ability of the
10  roof.  So granules off the roof doesn't affect the
11  water shedding ability, it may affect the longevity
12  of the shingle, as with normal wear and tear, but
13  for us, hail damage is considered matting breakage.
14  Q   "Us" being State Farm?
15  A   Yes, sir.  And that's brought upon by the
16  studies of Haag Engineering.  That's the standard
17  for insurance companies as well.
18  Q   And State Farm provides you with that Haag
19  training; correct?
20  A   Yes, sir.  We do that yearly.
21  Q   Do you know if there's any kind of cosmetic
22  exclusion in the Bales' policy?
23  MR. BROWN:  Object to the form.
24  THE WITNESS:  I did not see a cosmetic
25  exclusion on the policy.

Page 161

1  Q   (By Mr. Lawson)  In your training and
2  experience as a State Farm adjuster, adjusting roof
3  claims, have you ever seen a cosmetic exclusion for
4  a composite shingled roof?
5  A   I don't believe we have a cosmetic
6  exclusion for composition shingles.  Typically, the
7  cosmetic exclusion applies to metal.  So if it's
8  just a dent, if it has a compromise in that
9  material, then it's not damage at that time.
10  Q   Okay.  I'm going to hand you Exhibit Number
11  9.  It's a big packet.  You testified there were
12  photos taken during that second inspection; correct?
13  (Plaintiffs' Exhibit Number 9 was
14  marked for identification purposes
15  and made a part of the record.)
16  THE WITNESS:  Yes, sir.
17  Q   (By Mr. Lawson)  Who took pictures?
18  A   I did.
19  Q   Did Mr. Fouda take any pictures?
20  A   He did not.
21  Q   Did you take pictures of everything that
22  you looked at?
23  MR. BROWN:  Object to the form.
24  THE WITNESS:  The best of my knowledge,
25  I did, yes.

Page 194

1    A   At their request, we can share a few of the
2  photos with them.
3    Q   If you're confident in your claims
4  adjusting, you should have no problem providing
5  those photos.  Fair?
6        MR. BROWN:  Object to the form.
7        THE WITNESS:  Yes.  The roof speaks for
8  itself, so any photos would just be an extension of
9  what the roof shows.
10    Q   (By Mr. Lawson)  Do you know if any photos
11  were ever provided to Meleah or the Bales family?
12        MR. BROWN:  Object to the form.
13        THE WITNESS:  I can't recall.  I don't
14  believe so.
15    Q   (By Mr. Lawson)  Do you agree that a
16  homeowner shouldn't have to file a lawsuit to
17  provide documentation about their insurance claim?
18        MR. BROWN:  Object to the form.
19        THE WITNESS:  Documentation provided is
20  the information that is pertinent to the claim that
21  we provide to all customers, so I believe they
22  received all of the information that was required on
23  this claim.
24    Q   (By Mr. Lawson)  I'm handing you what's
25  marked as Exhibit Number 15.  This is a letter dated

Page 195

1  March 21st of 2022, sent from Ms. Meadows; correct?
2        (Plaintiffs' Exhibit Number 15 was
3        marked for identification purposes
4        and made a part of the record.)
5        THE WITNESS:  Yes.
6    Q   (By Mr. Lawson)  Do you recall receiving
7  this letter?
8    A   Yes.  I think the in-office adjuster
9  received it first and then I did review the letter
10  after she saw it.
11    Q   It looks like the photos were sent to Ms.
12  Meadows and she had an opportunity to respond to
13  them; correct?
14    A   I think she received a copy of the initial
15  inspection report, yes.
16    Q   She states in this letter, upon review of
17  Mr. Leach's photographs, you can see that he noted
18  10-plus hits in the test squares; correct?
19        MR. BROWN:  Object to the form.
20        THE WITNESS:  That's what she is
21  claiming.  That's what she notes, right.
22    Q   (By Mr. Lawson)  This raised a concern with
23  Ms. Meadows because the report contradicts this;
24  right?  I'm sorry.
25    A   It wasn't the inspector who made those

Page 196

1  notations.  Those notations were made by the roofer.
2    Q   Were you present during that inspection?
3    A   No.  The roof inspectors are not to make a
4  10-plus or write the number of hits on a roof like
5  that.  I would have to review, but I don't believe
6  that was even the same color of chalk that he was
7  using on the roof, I believe.
8    Q   Regardless, if -- well, Meleah expressed
9  concern that Korbin Leach had marked 10-plus hits
10  per square and that was different from what was
11  reflected in his report; correct?
12        MR. BROWN:  Object to the form.
13        THE WITNESS:  Well, at this point we
14  had already done a second inspection with her on the
15  roof, so it was all a moot point.  Because when we
16  were on the roof with her, what she documented --
17  what she believed was hail damage, was not hail
18  damage.
19    Q   (By Mr. Lawson)  It's reasonable for her --
20  for a public adjuster to be concerned about
21  differences between what a ladder assist says on the
22  roof versus what's reflected in his report.  Fair?
23        MR. BROWN:  Object to the form.
24        THE WITNESS:  Yeah.  She believed that
25  the inspector wrote the 10-plus on the roof, but

Page 197

1  later said no damage, that would be concerning, but
2  it wasn't the inspector who wrote those.
3    Q   (By Mr. Lawson)  That's something you would
4  want to confirm because you weren't at that initial
5  inspection; correct?
6    A   Yes, sir.
7    Q   Did you ever talk to Mr. Leach about
8  whether he marked -- made the 10-plus hits markings
9  on the roof?
10        MR. BROWN:  Object to the form.  I know
11  we're asking a lot of questions about this.  Let the
12  witness look at the report and maybe we can clarify.
13        MR. LAWSON:  Sure.
14        THE WITNESS:  Okay.  So it appears that
15  Korbin's chalking would have been blue.  I do see
16  right here that he writes 10-by-10 on the roof.
17    Q   (By Mr. Lawson)  What page are you looking
18  at?
19    A   This is page 405.  And then there is -- in
20  that picture, there's an F equals 10.  I can't make
21  out the next symbol, but I would assume it says F
22  equals 10-plus in white chalk.  And there's also
23  several circles in white chalk.  So I would assume
24  the white is from the roofing inspector, who was
25  there present with Korbin.

Page 198

1    Q   But that's an assumption on your part?

2    A   That is going to be -- that is my

3  assertion.  Also, page 409, there are blue circles

4  where Korbin has circled areas for consideration.

5  It's a typical activity by these inspectors when the

6  roofer is present there with them, the roofer wants

7  them to circle certain items for us to consider.  So

8  the blue chalk is guaranteed to be Korbin's and the

9  white appears to be what the roofer had marked

10  previously.  It also appears that he used the blue

11  chalk to draw out a test square at the corner edges

12  of the square and it's consistent with our 10-by-10

13  on page 415.  And that is a consistent marking on

14  the roof by these roofing inspectors.

15    Q   What about page 426, the top photo?

16    A   Yeah.  I was going to point that out.  And

17  then also, you can see a better shot of that on --

18    Q   434?

19    A   Yes.  Yep.  There is a better shot.  So

20  that looks like it says back equals 10-plus and

21  that's in blue, so.

22    Q   And you asserted that the blue chalk was

23  from Mr. Leach; correct?

24    A   Yes, sir.  So he would have written that on

25  the roof.

Page 199

1    Q   So if he's saying back equals 10-plus, but

2  his report says no hail damage, that's inconsistent

3  -- an inconsistency between his photos and the

4  report.  Fair?

5        MR. BROWN:  Object to the form.

6        THE WITNESS:  My understanding is that

7  he's saying back equals 10-plus circles for

8  consideration, as he is not able to make a coverage

9  decision on there.  So he's documenting the number

10  of blemishes that he sees.

11    Q   (By Mr. Lawson)  Did you ever call Mr.

12  Leach to clarify that?

13    A   I did not.  I didn't speak to him.

14    Q   You didn't investigate that?

15        MR. BROWN:  Object to the form.

16        THE WITNESS:  I did not speak to him

17  about it.

18    Q   (By Mr. Lawson)  Ms. Meadows brought the

19  potential for a discrepancy to your attention.

20  Fair?

21        MR. BROWN:  Object to the form --

22    Q   (By Mr. Lawson)  In this March 21st letter?

23    A   It does, yeah.

24    Q   Looking again at that March 21st letter,

25  the second paragraph brings up a concern that during

Page 200

1  the second inspection with Mr. Fouda, expresses some

2  concern about that second inspection; correct?

3    A   She has concerns about him being present, I

4  guess, yes.

5    Q   What's she's saying is it's clear Mr.

6  Fouda was there to discount anything that may have

7  been considered as hail damage; correct?

8    A   That's what she is claiming, yes.

9    Q   We talked about that earlier.  You don't

10  want to be disagreeing with a fellow claims adjuster

11  in front of the insured or representatives; right?

12    A   I do believe we said that we don't have --

13  allow a verbal disagreement.  We could have

14  definitely a conversation with regard to what we're

15  seeing on the roof, but his presence made no

16  difference in regard to my accurate assessment of

17  that roof.

18    Q   Also, in that second paragraph she says

19  "State Farm is imposing a company guideline of

20  saying there needs to be mat fracturing or bruising

21  present to deny the hail damage."

22    Did I read that correctly?

23    A   Yes.

24    Q   And we've talked about that.  That's your

25  understanding of what hail damage is; correct?

Page 201

1        MR. BROWN:  Object to the form.

2        THE WITNESS:  Yes.  According to the

3  experts in Haag Engineering and according to science

4  and review that a fractured shingle would compromise

5  the water shedding ability.  Shingles without

6  granules, there's really no structural damage to

7  that shingle itself.

8    Q   (By Mr. Lawson)  And that's how State Farm

9  has trained you to evaluate hail damage; correct?

10        MR. BROWN:  Object to the form.

11        THE WITNESS:  That's how I would say

12  all insurance companies evaluate hail damage.

13    Q   (By Mr. Lawson)  Have you received training

14  from any insurance company other than State Farm?

15    A   No.  I know for sure that's how State Farm

16  instructs us, but Haag is an industry standard and

17  that's how they tell anyone adjusting roof claims

18  that that's what hail damage would be.  So if

19  they're using Haag standards, that's what Haag is

20  saying is there has to be matting breakage.

21    Q   Okay.  Are you required -- does State Farm

22  require you to respond to all correspondence from a

23  policyholder or one of their representatives?

24    A   Yes.

25    Q   How long should it take you to respond?

Page 206

1    THE WITNESS:  No.  We provide a fair
2 evaluation of their claim every time we do an
3 inspection of their loss.
4    Q  (By Mr. Lawson)  Do you agree with me that
5 if this storm damaged the Bales' home during the
6 policy period, no matter what happened in the past,
7 it's covered?
8         MR. BROWN:  Object to the form.
9         THE WITNESS:  If the storm takes place
10 during the policy period, we'll definitely come out
11 and investigate the loss.
12    Q  (By Mr. Lawson)  And if it's a covered
13 cause of loss, it should be paid regardless of
14 anything that might have happened in the past;
15 correct?
16         MR. BROWN:  Object to the form.
17         THE WITNESS:  If it's a covered cause
18 of loss and the inspection of the property reveals
19 damage consistent with that, then we would pay for
20 the roof.
21    Q  (By Mr. Lawson)  The Bales should receive
22 insurance benefits for that loss.  Fair?
23    A  Correct.  If I find damage consistent with
24 that, with wind, damage consistent with hail, then
25 they'll be paid for that.

Page 207

1    Q  Do you agree older roofs are more
2 susceptible to wind and hail damage?
3         MR. BROWN:  Object to form.
4         THE WITNESS:  Yes.  Older roofs, 15, 20
5 years old would be.  An 11-year-old roof in my mind
6 is not classified as old, but I would say I would
7 classify a roof 15, 20, 18 to 20 years old as an
8 older roof.
9    Q  (By Mr. Lawson)  Okay.  Is there anything
10 that you would change about how you handled the
11 Bales' claim?
12         MR. BROWN:  Object to the form.
13         THE WITNESS:  I would have liked to
14 have gotten the gutter linear footage correct on the
15 original estimate and perhaps been involved with the
16 additional emails from Meleah after the claim was
17 moved back to in-office, but other than that, I
18 believe I handled this fairly and appropriately.
19    Q  Do you stand by your position that none of
20 the damage to the singles is hail damage?
21    A  Yes, sir.
22    Q  And you reached that determination based on
23 your training and experience with State Farm?
24    A  Yes, sir.
25    Q  Do you believe you handled this claim in

Page 208

1 compliance with State Farm's requirements?
2    A  I do.
3    Q  Have you understood all of the questions
4 that I have asked today?
5    A  I have.
6    Q  Or asked me to rephrase?
7    A  I have.
8    Q  Have I been polite and professional to you?
9    A  You have.
10         MR. LAWSON:  I don't have any further
11 questions.  I'll pass the witness.
12         MR. BROWN:  I typically don't ask any
13 questions, so I don't want to keep you any longer,
14 but I do think we need some clarification.
15              CROSS EXAMINATION
16 BY MR. BROWN:
17    Q  If you'll go to Exhibit 4, Ladder Now.  And
18 there was a lot of talk about the color of chalk
19 used.  I mean, you weren't at the inspection.  Fair
20 enough?
21    A  Fair enough.  Yes.
22    Q  You don't know who had color chalk or who
23 didn't have color chalk or whatnot, but there are
24 some markings on the roof.  True?
25    A  Yes.

Page 209

1    Q  If you'll look, start on page 427 with me,
2 and then kind of going through the next couple of
3 pages 428, 429, 430, 431, 432.  And you'll see that
4 there's markings on the roof in blue chalk.
5    A  Yes.
6    Q  Circular in nature on all of those pages;
7 correct?
8    A  Yes.
9    Q  And then these inspection images also have
10 a description to the left of them, don't they?
11    A  Yes.
12    Q  What does that say?
13    A  PA contractor considerations.
14    Q  Does that lead you to believe that this is
15 being marked as what the contractor is considering
16 as hail damage?
17    A  Yes.
18    Q  And not Korbin?
19    A  Yeah.  And sometimes actually those guys
20 may hand the chalk to the roofer and say mark what
21 you think, what you're seeing as hail and I'll
22 document that for the adjuster.
23    Q  But nonetheless, the report that Korbin
24 sent indicates there was no hail damage to the roof.
25 Is that true?