```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF OKLAHOMA


(1) ROBERT BALES and          )
(2) DANIELLE BALES,           )
                              )
          Plaintiffs,         )
                              )
     -vs-                     ) Case No. 22-CV-00851
                              )
(1) STATE FARM FIRE AND       )
CASUALTY COMPANY,             )
                              )
          Defendant.          )
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF ROBERT BALES

TAKEN ON BEHALF OF THE DEFENDANT

TAKEN AT 525 SOUTH MAIN STREET

TULSA, OKLAHOMA

JULY 21, 2023

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BALLARD REPORTING
611 WEST 15TH STREET, C-3
TULSA, OKLAHOMA  74127
(918) 407-2278
ballardreporting@gmail.com

\* \* \* \* \* \* \* \*

REPORTED BY:  ASHLEY BALLARD, CSR

```
 1  Q.  What did you review?
 2  A.  My notes.  Some of those other documents that --
 3  Q.  The discovery responses?
 4  A.  Yeah, some of those.
 5  Q.  When you say your notes, what are your notes?
 6  A.  Just my best recollection.
 7  Q.  Did you keep a diary in this claim?
 8  A.  No.  No.
 9  Q.  So what are these notes?  Are they in the computer?
10      Are they written down?
11  A.  They're just written down on a piece of paper.
12  Q.  Did you write these notes down contemporaneously as
13      things were going on or did you go back at some
14      point and try to put an outline together?
15  A.  I suppose probably a little bit of both.
16  Q.  When is the last time you made a note?  Is this
17      just one document?
18  A.  Yeah, it's just a couple of notes.
19  Q.  When is the last time you put an entry in that?
20  A.  When the adjuster, for the second time, finally got
21      up on the roof.  J.R. Phillips and the other
22      adjuster, they were playing good cop/bad cop,
23      yelling, and that was the last -- that was the last
24      note that I made.
25  Q.  So all pre-litigation?
```

1   Q.   It's not unreasonable to investigate a claim;
2        correct?
3             MR. LAWSON:  Object to the form.
4   A.   No.  I think it's under investigated.
5   Q.   (By Mr. Brown)  You would agree with me it's not
6        unreasonable to investigate a claim.  If somebody
7        makes a claim, you should investigate that claim?
8   A.   Yes, you should.  You should.
9   Q.   And you would agree with me it's not unreasonable
10       for people to have differences of opinions; true?
11  A.   Correct.
12            MR. LAWSON:  Object to the form.
13  Q.   (By Mr. Brown)  And you understand in this case we
14       do have a difference of opinion as to what is
15       damaged on your roof?
16            MR. LAWSON:  Object to the form.
17  A.   Correct.
18  Q.   (By Mr. Brown)  The PA thinks you have hail damage
19       to your roof and State Farm says we don't see hail
20       damage to your roof.  That's the premise.  Is that
21       your understanding?
22            MR. LAWSON:  Object to the form.
23  A.   Yes.
24  Q.   (By Mr. Brown)  Do you believe that a disagreement
25       on a claim is a breach of contract or is acting in

1  A.  True.
2  Q.  But the mere fact that there's a disagreement, how
3      does that -- how do you indicate that they failed to
4      properly evaluate just because there's a
5      disagreement?
6          I understand you don't agree with what State
7      Farm's position is, but how did they fail to
8      properly evaluate or fail to properly inspect your
9      roof?  Is there something else they should have done
10     they didn't do?
11 A.  You know, when you have several experts with the
12     same opinion, that the damage is caused by wind and
13     hail, and from what I understand, that State Farm is
14     not even following their little pamphlet of what a
15     hail strike looks like and -- it just -- as a
16     homeowner, that I think would strike anyone as not
17     properly evaluating, you know, the roof.
18 Q.  And when you use the term expert, are you referring
19     to Ms. Meadows as a roofing expert?
20 A.  And my roofer.
21 Q.  And the OCR guy?
22 A.  Yes.
23 Q.  As roofing experts?
24 A.  Yes, and --
25 Q.  What about, on the other side of that argument, the

```
 1   A.   Fair enough.
 2   Q.   But I'm asking you, do you consider the people who
 3        said there is no hail damage to the roof itself as
 4        experts, or they're not experts?  That's the only
 5        thing I was asking.
 6   A.   I don't know.
 7   Q.   Okay.  We talked about punitive damages earlier.
 8        Do you recall that --
 9   A.   Yes.
10   Q.   -- discussion with your wife?
11   A.   Uh-huh.
12   Q.   Are you asking this jury to punish State Farm for
13        its difference of opinion about the damage to your
14        roof?
15             MR. LAWSON:  Object to the form.
16   A.   I believe it's more than just a difference of
17        opinion, because State Farm is not even following
18        their own protocols.  They have a pamphlet and
19        trainings for their individuals that show what a
20        hail-damage strike is supposed to look like and
21        they're not even following their own protocols.
22   Q.   (By Mr. Brown)  What's that based off of?
23   A.   State Farm's information, their own materials.
24   Q.   You say a pamphlet.  Do you have a pamphlet from
25        State Farm?
```

| | | |
|---|---|---|
| 1 | | in her deposition, the various subparts? |
| 2 | A. | Uh-huh. |
| 3 | Q. | Failing to properly investigate, withholding |
| 4 | | benefits, refusing to honor your claim by applying |
| 5 | | restrictions, et cetera, et cetera. |
| 6 | | Other than what you've already testified to |
| 7 | | today, do you have anything else to add to those as |
| 8 | | criticisms of State Farm, what they did or did not |
| 9 | | do? |
| 10 | A. | Yes. |
| 11 | Q. | Please explain. |
| 12 | A. | On the second inspection, J.R. Phillips and his |
| 13 | | counterpart -- excuse me.  I cannot remember his |
| 14 | | name. |
| 15 | Q. | No problem. |
| 16 | A. | Forgive me.  They got on the roof and Meleah was, |
| 17 | | you know, talking to them about the roof situation, |
| 18 | | and it became very evident that their discussion on |
| 19 | | the roof, the second individual from State Farm - I |
| 20 | | cannot remember his name - was acting very |
| 21 | | inappropriate towards Meleah. |
| 22 | | And I can hear him being just very rude and |
| 23 | | unprofessional, you know.  I can hear him raising |
| 24 | | his voice, you know, and it was -- and it was |
| 25 | | very -- it seemed to me to be a good cop/bad cop |

```
 1       type of situation where J.R. can see where she --
 2       where Meleah would say this is hail damage and J.R.
 3       was like okay, but the other individual was like no,
 4       no, no, no, no, and I can hear him raising his voice
 5       and I -- and, you know, that -- that -- that --
 6       that -- that bothered me.
 7   Q.  Well, I have a question.  I thought your earlier
 8       testimony was you had never met Meleah.  Am I
 9       mistaken?
10   A.  Yes, you are.
11   Q.  Okay.  You have met Meleah?
12   A.  When she came to my house, yes.
13   Q.  For the second inspection.  You were there?
14   A.  Yes.
15   Q.  Okay.  You hadn't met her before that point in
16       time?
17   A.  (Witness nods head up and down.)
18   Q.  Okay.  Now I'm following you.
19   A.  Okay.
20   Q.  Is that the first time you met her, is when she
21       came to your inspection in person?
22   A.  It seems like -- I recall that there was an
23       initial -- she came over to look at the roof and --
24       to, you know -- just to kind of get a -- you know,
25       her own look at the roof.
```

```
 1  Q.  Are you saying she came over on a different day?
 2  A.  I believe so, if my memory ...
 3  Q.  And I don't want you to guess.  If you don't
 4      remember something, that's okay.  Just like you
 5      don't remember her name.
 6          And then you said that you overheard them on
 7      the roof.  Were you on the ground, I presume?
 8  A.  I was inside the house.
 9  Q.  And you could hear them on the roof having
10      conversations?
11  A.  Oh, yes.
12  Q.  And you believe J.R. was agreeing with Ms. Meadows
13      of hail to the roof and this other gentleman was
14      saying no?
15  A.  Yes.
16  Q.  Have you read Mr. Phillips' deposition that was
17      taken last week?
18  A.  No.
19  Q.  Have you had any discussions about his deposition?
20  A.  No.
21  Q.  Would it surprise you if he said that he didn't
22      find hail damage?
23  A.  That's his opinion.
24  Q.  Well, would you think that he would lie under oath?
25  A.  I have no idea.
```